UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. _____-CIV-

SECURITIES AND EXCHANGE
COMMISSION,

       *Plaintiff,*

        v.

TIMOTHY J. ATKINSON, JAY PASSERINO,
ALL IN PUBLISHING, LLC, WILLIAM E.
BERRY, BERRY MEDIAWORKS, LLC and
SHMUEL POLLEN,

       *Defendants.*

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges:

## SUMMARY OF THE ACTION

1.      This case concerns U.S.-based marketers who engaged in a massive fraud involving the offer and sale of securities called "binary options" through false, misleading and otherwise deceptive videos, websites, and other forms of marketing promoted on the Internet and disseminated via spam email to tens of millions of prospective investors in the U.S. and globally.

2.      Beginning in at least October 2013 through at least November 2016 ("Relevant Period"), Defendant Timothy Atkinson and his assistant, Defendant Jay Passerino, through their firm, Defendant All In Publishing, LLC ("AIP") (collectively, the "Marketing Defendants"), conducted numerous marketing campaigns that fraudulently solicited and induced investors to open and fund unregistered, off-exchange binary options trading accounts.  A binary option is a financial instrument with a payoff value tied to the price of another financial asset, such as a

share of stock, but which gives the holder no right to purchase or sell such underlying asset.  In offering these binary options, the Marketing Defendants acted as so-called "affiliate marketers," who typically sell a third party's goods or services, often over the Internet, and receive a commission for each sale.  Here, the Marketing Defendants promoted the purchase of binary options securities from unregistered third-party brokers.

3.      The Marketing Defendants' campaigns included professional videos that touted a free software trading program running on autopilot that was supposedly capable of generating large profits for investors who opened accounts on the instructions that followed the videos. These videos purported to show actual investors and real results, including people enjoying rich lifestyles achieved through binary options trading, and "live" demonstrations of people opening and funding accounts in "real time" and seeing their trading balances increase automatically. The participants in the videos insisted to viewers that these were actual events.

4.      Yet what was depicted was entirely fiction.  Paid actors pretended to be recent millionaires; fake testimonials claimed falsely that there was great wealth made by investing in, and using the free trading software to purchase, binary options; and fabricated photos showed only fictional account statements.  The "live" demonstrations of profitable trading were shams.

5.      Samples of the Defendants' videos may be viewed here:
https://www.sec.gov/video-exhibits-SEC-v-Atkinson.  The videos are incorporated into this Complaint by reference as examples of the Defendants' fraudulent materials.

6.       Atkinson wrote the scripts underlying the videos or paid Defendant Shmuel Pollen, a New Jersey-based Internet scriptwriter, to create the scripts for use in these campaigns. Atkinson then paid Defendant William Berry and his production firm, Defendant Berry MediaWorks, LLC, to turn the scripts into videos.  Berry hired actors and rented expensive

homes, luxury cars and other props that supported the illusion that the videos' participants had accumulated great wealth by making the investment touted in the videos.

7.      The Marketing Defendants created websites for each marketing campaign.  The websites featured videos and visual materials from the videos, and operated as platforms for recipients of spam and video viewers to be misled further by the Defendants' scheme.  The websites then funneled readers to "recommended" brokers for funding new accounts to trade in binary options.  The websites often misled investors to continue to believe, as featured in many videos, that trading and profit-making would start automatically with the initial deposit of funds.

8.      The Marketing Defendants received a flat commission from a broker, customarily between approximately $350 and $450, for every investor who viewed their materials and then opened and funded a binary options account for trading.  Over the Relevant Period, the Marketing Defendants received millions in commissions from brokers.

9.      Atkinson was part of an informal group of prominent binary options marketers in the U.S. and abroad who coordinated their activities via an invitation-only Skype chat.   In these chats, marketers announced their upcoming campaigns and agreed to disseminate each other's materials through their own email lists, thus vastly expanding the universe of possible investors to be defrauded.  The Marketing Defendants paid their fellow marketers a commission each time they sent AIP campaign materials to those who then opened and funded accounts.  As a result, millions of prospective investors viewed the Marketing Defendants' fraudulent promotional materials.  The Marketing Defendants also participated for a commission in the campaigns of their fellow marketers, earning substantial sums of additional money based on fraudulent offering materials.  The Marketing Defendants disseminated the campaign materials of their

fellow marketers to their own email lists and received a flat commission from fellow marketers for every recipient of those emails who then opened and funded accounts for trading.

10.     As a result of these campaigns, approximately 50,000 investors deposited with brokers an aggregate of approximately $12.5 million to initially fund accounts to trade binary options.  After initially funding accounts, investors were often fraudulently induced by brokers to deposit even more funds.  Most investors eventually lost most or all of their money, with total losses in at least the tens of millions of dollars.

11.     In their private Skype chats, Atkinson and other marketers ridiculed investors who traded binary options based on their marketing materials, calling the investors demeaning names. In one May 2014 chat, Atkinson laughingly talked about raising "charity" for customers who lost money investing in binary options.  Atkinson asked another marketer, Antonio Giacca, if he had started a charity "for all the fallen customers of your last offer?  Customers Come First Fund?" Giacca replied, "[D]oing a fund raiser for them, to put them back on track, so we can scam them again."  Atkinson replied, "LOL exactly!"  Giacca responded, "[T]he whole idea is to show them that there is hope, then take it all away one time lol." Atkinson answered, "[J]ust ONE more time hahahaha . . . love the slogan son!"

12.     By virtue of this conduct and other conduct described in this Complaint, the Marketing Defendants violated the antifraud provisions of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5.  The Marketing Defendants were substantial participants in an illegal offering or sale of unregistered securities and also violated the registration provisions of Section 5 of the Securities Act, 15 U.S.C. § 77e.  Defendant Atkinson is liable for violations of Section 10(b) of the Exchange Act

and Rule 10b-5 directly and also, under Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b), for activities taken through or by means of AIP, Passerino, and fellow marketers who he enlisted to publish his fraudulent campaigns.  Defendant Atkinson also violated Section 10(b) and Rule 10b-5 as a control person of AIP, and is liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  The Marketing Defendants are each further liable pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), and Section 20(e) of the Exchange Act, as aiders and abettors of each other in fraud that violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5, and of such fraud by fellow marketers whose binary options campaigns the Marketing Defendants substantially assisted in publicizing.

13.     By writing scripts and making videos for and with knowledge of the Marketing Defendants' fraudulent binary options campaigns, and for and with knowledge of the fraudulent binary options campaigns of others not named in this Complaint, Defendants Pollen and Berry (and Berry Mediaworks), respectively, are liable pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), and Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), as aiders and abettors of fraud in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Berry is further liable for violations of Section 10(b) and Rule 10b-5 as a control person of Berry Mediaworks.

14.     The Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, disgorgement of ill-gotten gains, injunctions, and such other relief as the Court may deem necessary and appropriate.  Unless restrained and enjoined by this Court, each of the Defendants is likely to continue to engage in the acts and practices alleged herein.

## JURISDICTION AND VENUE

15.     The Commission brings this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).  Defendants each have, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails in connection with the activities alleged in this Complaint, including by making use of the Internet to offer securities and sending or receiving interstate email and participating in interstate voice or video calls.

16.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act and Section 27(a) of the Exchange Act because Defendants are found in, inhabit, or transact business in the Southern District of Florida, and acts and transactions in violation of the federal securities laws as alleged in this Complaint have occurred within this district, among other places.

## DEFENDANTS

17.     **All In Publishing, LLC** ("AIP") was established as an Arizona limited liability company in 2012.  On or about February 19, 2014, AIP became a Florida limited liability company with its principal place of business in Miami, Florida.  During the Relevant Period, Timothy Atkinson was the owner and president of AIP.

18.     **Timothy Joseph Atkinson** ("Atkinson"), age 38, resides in Miami, Florida. During the Relevant Period, he was the sole owner and president of AIP.  Atkinson was also a signatory to and controlled AIP's bank accounts, and controlled and supervised all AIP business.

19.     **Jay Passerino** ("Passerino"), age 37, resides in Miami-Dade County and/or Broward County, Florida.  During the Relevant Period, he lived and worked in Miami, Florida. From January 2014 through approximately October 2016, he oversaw the day-to-day operations

of AIP, represented himself to others as the Vice President of AIP, and shared in AIP's profits

for his services.  During the Relevant Period, Passerino was also a signatory to AIP's bank

accounts and conducted AIP business in his own name and also in the name of an entity called

Gasher, Inc.  Passerino was described by Atkinson as Atkinson's "right hand man" at AIP.

20.     **William E. Berry** ("Berry"), age 59, resides in Portland, Oregon.  Berry directed,

edited, and produced videos used in marketing campaigns for binary options, including for

Atkinson, but also for other affiliate marketers fraudulently offering binary options to investors.

21.     **Berry Mediaworks, LLC** ("BMW") is an Oregon limited liability company with

its principal place of business in Wilsonville, Oregon.  During the Relevant Period, Berry

directed and controlled BMW's operations and billed many of his services through BMW.

22.     **Shmuel Pollen** ("Pollen"), age 30, resides in Rockaway, New Jersey.  Pollen

wrote scripts for the video productions used in approximately eight affiliate marketing

campaigns for binary options, including scripts for six AIP campaigns.

## FACTS

### I.     AFFILIATE MARKETING IN BINARY OPTIONS SECURITIES

23.     Binary options are financial instruments with a value tied to the price of other

financial assets, including securities.  An investor chooses whether the underlying asset's price

will be above or below a certain price at a particular time (*e.g.,* will Apple stock be above $100

per share at 1 p.m. on a particular day).  The options are considered "binary" because they carry

only two possibilities: the investor whose prediction is correct makes money; the investor whose

prediction is incorrect loses the investment.  Unlike other types of options, a binary option does

not give the holder the right to purchase or sell the underlying asset—instead, it is "cash settled."

24.     Binary options referencing a security or securities within the meaning of Section

2(a)(1) of the Exchange Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act,

15 U.S.C. § 78c(a)(10), are themselves "securities" within the meaning of those provisions.

25.     "Affiliate marketing" is a form of performance-based marketing primarily conducted via email solicitations and promotional materials made available on Internet websites. "Affiliate marketers" typically promote a product or service owned or provided by a third party (*e.g.,* a vendor.)  Affiliate marketers are paid a commission by the vendor when they induce customers to buy the vendor's product or service.  Here, binary options brokers paid the Marketing Defendants a pre-set commission (typically $350 to $450) for each investor who opened and funded an account with those brokers after viewing fraudulent marketing materials.

## II.    THE FRAUDULENT OFFER OR SALE OF BINARY OPTIONS

26.     During the Relevant Period, the Marketing Defendants launched, primarily through AIP, at least twenty (20) affiliate marketing campaigns for binary options, including:

(1) Automated Income App (from at least late 2013/early 2014);
(2) Golden Goose Method (from at least January 2014 until at least March 2014);
(3) Push Button Millionaire (from at least Feb. 2014 until at least Sept. 2015);
(4) Rock Star Commissions (from at least March 2014);
(5) Auto Money App (from at least June 2014 until at least July 2015);
(6) Cash Code (from at least June 2014 until at least April 2016);
(7) Free Money System (from at least June 2014);
(8) Free Money App (from at least June 2014 until at least June 2015);
(9) Quick Cash System (from at least June 2014 until at least May 2016);
(10) Easy Money Machines (from at least June 2014 until at least June 2015);
(11) Free Cash (from at least July 2014 until at least October 2015);
(12) Secret Millionaire Society (from at least Oct. 2014 until at least June 2015);
(13) Cash Software (from at least October 2014 until at least December 2014);
(14) Push Button Commissions (from at least Jan. 2015 until at least April 2015);
(15) Binary Cash Creator (from at least May 2015);
(16) Free Millionaire System (from at least May 2015);
(17) Easy Money Method (from at least May 2015);
(18) Fast Cash (from at least October 2015 until at least June 2016);
(19) Push Money App (from at least June 2016  until at least October 2016); and
(20) Click Money System (from at least October 2016).

27.     The Marketing Defendants' campaigns typically promoted free software, applications, or trading systems (hereinafter "software") that purported to successfully trade

automatically in binary options related to securities and other assets.  The Marketing Defendants lured individuals in the marketing materials by promising free access to the software.

28.     The touted software did not exist, or did not produce the results promised.  The Marketing Defendants' true goals were not to provide any such software but to earn commissions via brokers by inducing prospective investors to open and fund a binary options trading account.

29.     The Marketing Defendants' campaigns typically worked as follows:

**Step 1:** Affiliate Marketer writes or retains copywriter (e.g., Pollen)
*Copywriter drafts fictional scripts for videos, website content, and false introductory emails to prospective investors, called "swipes."*

**Step 2:** Affiliate Marketer retains video producer (e.g., Berry) to make videos based on scripts
*At affiliate marketer's direction, producer hires actors, creates sets, rents props and obtains false screenshots of account statements or other fake "proof."*

**Step 3:** Affiliate Marketer creates website, embeds video, places web site on Internet
*Web site references "recommended" binary options brokers, sometimes expressly says investors will be trading binary options.*

**Step 4:** Affiliate Marketer recruits "sub-affiliates" to promote campaign, offering commissions as incentives
*Affiliate marketer also offers prizes to sub-affiliates whose spamming nets most new investors.*

**Step 5:** Sub-affiliates disseminate campaign materials to their email lists, typically tens of thousands of addresses

**Step 6:** People receive spam emails, click on embedded link, go to campaign website, view fictional videos, and are urged to open and fund account to begin auto-trading
*Videos include false "testimonials" of supposed past users of software describing their proceeds and displaying their rich lifestyles, including luxury homes and cars that are actually rented props. Some videos falsely depict investors opening new accounts "live," in real time, then "refreshing" account balances online to see instant profits.*

**Step 7:** Investors open acct with the campaign's "recommended" binary options broker, provide contact information, and make initial deposit with broker, typically $250.

**Step 8:** Broker receiving investors' initial deposits pays commission to Affiliate Marketer for each investor who funds account after watching marketer's video

**Step 9:** Affiliate Marketer shares commissions with sub-affiliates whose emails induce customers to open and fund new brokerage accts
*Affiliate marketers (and sub-affiliate spammers) are paid only when persons receiving their marketing materials open and fund a new brokerage account.*

30.     Each marketing campaign for binary options conducted by the Marketing
Defendants included:  (1) a website; (2) at least one video; and (3) emails known as "swipes."
Each of these components included materially false or misleading statements and artifices or
devices designed to elicit interest and deceive recipients with false appearances of fact, so
recipients would open and fund binary options trading accounts and earn the Marketing
Defendants substantial commissions from the brokers.  The Marketing Defendants knowingly
used these three components in their marketing campaigns, and they did so with knowledge of
their false, misleading and deceptive nature.

### A.     Marketing Defendants' Websites

31.     In each campaign, the Marketing Defendants sent bulk email solicitations
designed to entice recipients to click an embedded electronic link in the email that routed the
user to the corresponding binary options campaign website.   The websites served as the vehicles
through which the Marketing Defendants carried out their binary options campaigns.  The
Marketing Defendants paid for and registered the domain names associated with each website,
which generally included some variation of the campaign name, e.g., http://automoneyapp.com.

32.     Passerino (or others that Passerino oversaw) had primary responsibility for
creating and formatting websites, registering the campaign website domains, setting up the
hosting mechanism, uploading the Marketing Defendants' content, and managing the technical
aspects of the campaign.  Passerino also ensured that the links on website pages correctly
directed interested persons to the campaign videos and ultimately to broker pages.  Atkinson
usually tested the functionality of the campaign websites.  Passerino was primarily responsible
for sending out the spam emails containing each campaign's website to prospective investors.

33.     The AIP campaigns' websites generally contained multiple webpages.  One page contained a streaming video, along with a field for entry of a name and email address.  The Marketing Defendants mined that personal data to add to their email lists for future spamming.

34.     Other webpages often included other videos about the trading software and forms to register or open a binary options account with specific "recommended" brokers.  These webpages emphasized the import of opening and funding the accounts.  A webpage for the AIP campaign, "Push Button Commissions," for example, said the broker account was "essential for success," as the software was "coded to work directly with this broker."

35.     New accounts could be opened through the webpages registered and hosted by the Marketing Defendants, but controlled by selected brokers or intermediaries.

36.     The Marketing Defendants' websites typically said that a minimum of $250 was required to activate the software, but they encouraged investors to provide more, saying "the more you deposit the better your profit will be."

37.     The AIP website pages frequently stated that the individual would be trading binary options, and also made clear that the trading would occur automatically upon funding the account.   For example, the Push Button Commissions website stated that the software "will do EVERYTHING for you to make a profit."  It added:  "As soon as you have made your deposit with the broker, the APP will activate, start trading and begin making you instant profits . . . ."

38.     AIP websites also included so-called "disclaimers" that themselves were false and misleading.   Website disclaimers for the binary options campaign, "Push Money App," for example, said that all persons portrayed in the videos were "real and verified;" that the video showed actual "examples" of trading results; that the industry was "one of the few where one can

write their own check in terms of earnings;" and that "[a]ny claims made of actual earnings or examples of actual results can be verified upon request."  None of that was true.

### B.   Marketing Defendants' Fraudulent Videos

39.   The Marketing Defendants' binary option websites each contained at least one streaming video about the trading product.   They created or procured videos for most of the binary options marketing campaigns that they launched on their own, and they intentionally or recklessly included materially false or misleading statements in the videos that they streamed, in order to trick viewers into opening and funding accounts with brokers.

40.   Atkinson often bragged about the quality of these videos and their realistic nature, and referred to them as "movies."  Atkinson wrote the scripts underlying the videos or retained Defendant Pollen to do so.   Pollen wrote at least six scripts for the Marketing Defendants and two additional scripts for other binary options affiliate marketers.  Atkinson reviewed Pollen's scripts, often made edits, and approved the final version.

41.   For each campaign, Atkinson or Pollen created a story about the advertised trading system and success stories from people who supposedly used the software system.  The scripts purported to describe real events, but the statements in the scripts were complete fiction. The events were not based on actual events; instead, they told made-up stories experienced by make-believe people.  When Atkinson retained Pollen to write a script, he provided Pollen with a general fictional story idea and directed him to use extreme hyperbole in creating a full script. The scripts also uniformly contained false and misleading statements about profits, risk of loss, the system's functionality and performance.  The software systems as described did not exist.

42.   Pollen knew or recklessly failed to know that his scripts were false and misleading.  He also knew that the Marketing Defendants would use his scripts to create videos

they would disseminate to prospective investors.  Pollen was concerned enough about his role that he used a pen name, "Mike Williams," to conceal his involvement in writing these scripts. During the Relevant Period, Atkinson paid Pollen approximately $85,000 for scripts.

43.     The Marketing Defendants provided finished scripts to Berry and retained Berry and BMW to create videos from those scripts.  Berry created at least eighteen (18) videos for the Marketing Defendants' binary options campaigns.  Affiliate marketers viewed Berry as the "go to guy" for high-quality videos that increased the likelihood of success in their solicitations. Berry produced videos for at least sixty-four (64) separate fraudulent binary options marketing campaigns launched by various marketers, including the Marketing Defendants.

44.     Berry's videos typically followed the scripts created by Atkinson or Pollen (or if not Atkinson or Pollen, his other clients).  Berry knew that the underlying scripts were fiction and knew that his videos based on those scripts were false and misleading to prospective investors.  Berry also knew that the Marketing Defendants disseminated these videos to induce prospective investors to open and fund accounts and trade binary options.

45.     Atkinson had substantial input into Berry's videos.  Atkinson often provided Berry with certain false images that were included in the videos, selected the setting or location for the shoot, and chose the actors.  Atkinson reviewed the videos and approved the final copies.

46.     At Atkinson's direction, Passerino uploaded the final copies onto the websites for AIP's campaigns.  Passerino knew that each video was materially false and misleading and did not reflect actual results when he posted them online and disseminated emails linking to them.

47.     The Marketing Defendants, Pollen and Berry purposefully created the scripts and videos used in AIP campaigns to be deceptive or misleading.  They incorporated various devices in the scripts and videos to create the false perception that they were describing actual events.

### 1.    Actors, Props and Claims of "Real" Profits

48.    None of the Marketing Defendants' binary options videos involved real users or creators of the advertised system.  Instead, the videos featured actors who described themselves as inventors or owners of the software and who served as hosts of the stories.  They told how they supposedly came to invent or acquire the software, which ran on autopilot and provided them millions of dollars, and guaranteed that viewers would enjoy similar results.

49.    As scripted, the actors brazenly lied about their roles and the fictional story lines, insisting that scenes shown in the videos were actual events.  An actor in the video for the campaign "Secret Millionaire Society" said, for example:

- "See, anyone can throw numbers around and whip up some proof shots. All the scammers do it.  This isn't that.  This is a completely different playing field.  And you're going to see real proof . . . you can't deny . . . and . . . in a way you've never seen before in your life."

- "Everything I'm about to tell you is 100% real and was experienced by me firsthand."

Those statements, and many like them in other videos, were false.

50.    Pollen made up the characters' names in his scripts — sometimes using a "random name generator" available on Google.

51.    The Marketing Defendants, Pollen, and Berry incorporated lavish, movie-style props in the scripts and videos in order to mislead viewers into believing that the characters enjoyed rich lifestyles because of their success trading binary options.  Atkinson or Pollen specified the type of props to use, and Berry rented those items – mansions, luxury vehicles, a private jet – from third parties for purposes of creating the videos.

## 2.      False "Live Trading Results"

52.      Marketing Defendants' videos purported to show actual trading results achieved in "real time."   For example, Berry produced the video for the binary options campaign "Cash Code," which was hosted by "Robert Allan."   The video showed a "live" video of Allan's account balance with big red letters across the screen, "LIVE ONLINE PROOF."   Allan said he "just" deposited $250 "risk-free" into his account and he will "show you the money it makes LIVE over the next 60 seconds.  We can back up every word we say with real life results."   The video then showed the account balance increasing eleven times in under one minute before settling at $356,910.  Allan, however, was a fictional character portrayed by an actor, and there was no trading account or any trading profits from Cash Code.  Instead, Berry fabricated the trading result "proof" displayed in the video at Atkinson's request.

53.      Similarly, the video for the AIP campaign "Push Money App" told a supposed running story concerning a group of "beta testers" invited to try the newest "PMA" trading system.   The video showed these beta testers "registering" new brokerage accounts on their laptops, which Berry filmed by incorporating "fake clicking" sounds to simulate typing on keyboards.  The beta testers then refreshed their accounts and, in 60 seconds, supposedly saw small profits in "real" time.  The video later fast-forwarded to a party some months later, when these same beta testers – now wearing more expensive clothing – celebrated their newfound wealth resulting from using the trading software.  Each claimed to have a bank account ranging from $600,000 to $1 million. In reality, the beta-testers were actors and there was no live trading. Atkinson wrote the scripts for the Push Money App campaign.

### 3.    False Proof & Testimonials

54.    Marketing Defendants' videos typically included fake "testimonials" in which purported past users of the advertised trading systems told how they supposedly came to receive large profits – indeed, some were now supposedly millionaires – by using the promoted software. They described how the software had generated profits automatically and how their newfound wealth had changed their lives.

55.    Atkinson wrote or directed Pollen to include such fake testimonials in scripts. Berry used images from the Internet to create fake photos of account balances that he included in his videos to support these testimonials.  For example:

- The Push Money App video included false images of investors holding checks reflecting supposed Push Money App profits – "Pamela Reid," $45,091.72; "Allen Squires," $85,783.49; "Jack Harwick," $129,912.21.

- The video for "Free Money System" included people saying they became millionaires in three months and screenshots of false bank and PayPal accounts;

- In the video for "Fast Cash," a 61-year-old army veteran named Gordon Powers claimed he deposited $250 in his trading account and, ten minutes later, saw more than $11,000 in his account.

56.    Atkinson knew that such testimonials were false but incorporated them in his videos because he knew they were persuasive and provided supposed "objective proof" to viewers that the software was real.  In one Skype chat, Atkinson urged other binary options marketers to make extreme claims in their marketing materials because they would result in more sales.  Atkinson said he "just spent 3 months crafting an offer . . . with crazy social proof etc.," adding that the best approach was to "show the software making trades and making money."   In another Skype chat, Atkinson bragged to his marketer colleagues about trying to "scam" investors with "18 fake testimonials."

16

57.     Pollen, who drafted certain testimonials, also knew they were false.  In fabricating dollar amounts in his testimonials, Pollen intentionally used specific amounts – down to the penny – because he viewed them as more realistic.

58.     Berry also knew the testimonials in his videos were fake.  At times Berry juxtaposed pictures of people he copied from the Internet next to quotes attesting to their purported experience with the software to create the illusion of attribution to a real person.  He created dozens of fake bank and trading statements for the Push Money App video that was ultimately disseminated to millions of prospective investors.  Berry also at times re-used bank and trading account statements from prior projects.

### 4.     False Guarantees of Profits

59.     In addition to showing purported profits from these binary options trading programs, Marketing Defendants' videos falsely depicted that profitable trading had occurred 100 percent of the time and guaranteed a similar success rate going forward.  For example:

- The "Secret Millionaire Society" video stated:  "And when you do get to the end of this video, you will also be rewarded with a guaranteed $1000 in your first 60 seconds and $10,000 in your first two days for free . . . You never lose . . .  the money will just grow and grow."

- The "Cash Code" video stated: "And our success rate? It's pretty clear. It's 100% accuracy.  All of our clients are financially independent within 60 days of using this system . . .  on average."  Later, the video said:  "a system either works or it doesn't.  And if it works . . . it works every time. And this one works.  Period."

- The "Auto Money App" campaign video promised: "All you need to do is . . . fill in your contact details . . . deposit $250, and within sixty seconds, watch your $250 investment turn into $400 . . . then from $400 to $15,000 in your first week, six figures in your first month, and over a million by day 90.  This is real money that will be in your bank account as soon as you complete the last step."

### 5.    Falsely Describing Trading Systems as Automated Trading

60.    The Marketing Defendants' videos also claimed that trading profits resulted "automatically."  For example, "Auto Money App" claimed: "My system trades binary options for you on complete autopilot.  You only have to push one button to make money and you actually earn money in 60 seconds."  Similarly, the "Fast Cash" video said: "We make hundreds of dollars and even thousands of dollars every 60 seconds on autopilot with the Fast Cash Biz."

61.    However, the trading systems as described in the Marketing Defendants' campaigns did not exist.  If any software existed, it was not programmed to auto-trade accounts but rather to provide trading signals from which users could make trading decisions themselves.

### 6.    False Statements that Individuals Must Act Quickly

62.    To create a false urgency to open and fund accounts, the Marketing Defendants' videos also falsely claimed that the opportunity to use the trading software was limited and that viewers needed to act at once.   For example, an actor in "Cash Code" claimed that the link to the video was sent to only a limited number of individuals, that they accept only 10 people per day, and the "button" to register is only available for ten minutes.

63.    In fact, no such limitations existed.   Pollen, at Atkinson's direction or at least with his approval, purposely included a "squeeze" or fake limited availability and time restriction in his scripts to create a sense of urgency for prospective investors to invest.

### C.    Marketing Defendants' Fraudulent Emails

64.    The third fraudulent component of the Marketing Defendants' binary options marketing campaigns was emails.  The Marketing Defendants widely disseminated their binary options campaigns to millions of email addresses.  The Marketing Defendants often used email lists that targeted recipients who they believed would be most receptive to their fraud scheme.

65. The Marketing Defendants wrote or hired Pollen and others to write short targeted emails (called "swipes") for their campaigns, primarily to prod individuals who received the initial solicitation but did not immediately open and fund a new trading account.

66. Atkinson retained and directed Pollen and other writers to create false email swipes about the trading software that would lure individuals to review the marketing materials.

67. For example, in or about June 2014, Atkinson retained the services of a copywriter to generate swipes for the Free Money System campaign. He explained to the copywriter that the Free Money System was "about making free money from a system that trades binary options" and directed the copywriter: "We want hypey spam emails . . . Try to create subject lines that trick people to open the emails ..[.] Then short, precise swipes to get them to click thru. That is our goal." The copywriter then wrote at least ten such emails. Atkinson forwarded these emails (along with his emails to the copywriter that referred to tricking people) to Passerino, directing Passerino to post the spam emails for dissemination by sub-affiliates.

68. These emails included such false statements as,

- "Have you heard of [sic] new free money system that created over 150 millionaires? … And get this – most of them made their first million in only 90 days";

- "My millionaire buddy is literally giving away $648 (and you're also going to learn about the free money system he used to bank over $850K in profit within 90 days)";

- "I've used this FREE money system and made over $6,500 in the last 72 hours. And that's without paying a single dime";

- "So I signed up for this free money system a few weeks ago and since then ... I've somehow banked over $100K in profits … All I know is my bank account keeps on growing bigger and I barely have to do any work..."; and

- "Our software will only be available for FREE for a limited time - as of now, there is only 5 more free slots available."

69.     The Marketing Defendants created and/or procured similarly deceptive email swipes for each binary options campaign.  Some campaigns used as many as approximately one hundred different fraudulent email swipes to send to prospective investors.

70.     Some email swipes created the false impression that they originated from the individuals (but who in fact were fictional) depicted in the Marketing Defendants' videos.  These emails fooled prospective investors by making the solicitation appear persuasive and credible. The swipes also uniformly contained false and misleading statements about the trading software.

71.     For example, on or about February 23, 2016, an email sent to prospects was purportedly signed by the founders of the fake Push Money App company.  That email contained numerous false statements, including:

> We have just closed a special deal with one of our major brokers.
> Everyone that registers their PM App today gets a matching
> deposit bonus . . . up to $10k if you're so fortunate . . .  Just in the
> past 24 hrs the PM App has made the new members a combined
> $118,927.36.  Just in the last 24hrs!  My friend, you are missing
> out on serious money if you haven't activated your app yet.  I
> know last year you were scammed with the Binary Options bots.
> Trust me, this is not one of those scams.  Not even close.  PMA
> Company received the Most Profitable Trading System award at
> the NY convention of 2015.  Yes we are a real, legit company that
> really wants to help you become filthy rich.

In fact, the Marketing Defendants sent out that email, not any founder of a trading app company; the trading results of purported users in the email were fake; there were no "beta testers" or any 2015 convention; and there was never a company called PMA Company.

72.     Later, in May 2016, the Marketing Defendants again provided prospective investors with false and misleading email swipes, again purportedly from Push Money App founders.   A swipe received by one prospective investor, a disabled veteran living on disability payments, reminded him to fund his trading account "to make possibly 7 figures in 180 days just

20

like our first group of beta testers!"  Another swipe stressed the software's "limited availability" and urged the recipient to fund his account "so you'll be able to start making money right away."

73.     Solicitation materials used by the Marketing Defendants frequently depicted trading account screenshots with trading by the software, or trading available through the account or the software, in security assets or binary options that reference security assets.   For example, the Automated Income App, Free Money System, and Push Money App videos combined showed nearly a dozen screenshots of trading accounts through which the supposed software and user could trade binary options with reference to stocks and indices.

## III.    THE MARKETING DEFENDANTS RECRUITED OTHER AFFILIATE MARKETERS TO DISSEMINATE THEIR FRAUDULENT CAMPAIGNS

74.     During the Relevant Period, the Marketing Defendants were among various other affiliate marketers, in the U.S. and elsewhere, who created and disseminated such marketing materials as described in this Complaint.  The Marketing Defendants and these other affiliates depended on each other to "support" their respective campaigns through email spams, in order to reach as many prospective investors as possible.   The affiliate who launched a new campaign essentially paid other affiliates to spam the new campaign's marketing materials to these other affiliates' email lists, which vastly broadened the number of persons who received the materials. Such email lists ranged from thousands to millions of email addresses.  When a third-party affiliate spammed another affiliate's launch, the third-party affiliate was called a "sub-affiliate."

75.     Atkinson and other major affiliate marketers for binary options, in the U.S. and abroad, coordinated their campaigns by speaking via an invitation-only Skype chat.  The members of this loose confederation used an Internet "calendar" system to coordinate the scheduling of marketing campaigns, ensuring that they did not launch competing campaigns on the same date.  As launch dates approached, an affiliate announced his upcoming campaign on

Skype and asked his colleagues in fraud (in a "sub-affiliate" role) to support his campaign by emailing potential investors. The affiliate marketer provided his marketing materials to sub-affiliates to spam prospective investors. The affiliate launching a new campaign typically shared his commissions with those sub-affiliates who successfully induced a prospect in the sub-affiliates' email lists to open and fund a trading account at the affiliate's broker.

76.     Using the Skype chat, Atkinson recruited sub-affiliates to spam AIP's latest binary options campaigns. Atkinson offered to pay sub-affiliates a commission of approximately $250-$300 each time a person, after receiving AIP marketing materials from a sub-affiliate, opened and funded an account with the campaign's recommended broker.

77.     Atkinson also ran contests that offered prizes to the most successful sub-affiliates, to create incentives for their continued spamming. The Marketing Defendants regularly paid thousands of dollars as prizes in these contests and in at least one instance awarded a Rolex watch to the winner.

78.     Passerino provided the false and misleading swipes to the sub-affiliates to use in their emails. Passerino monitored the effectiveness of AIP campaigns and the effectiveness of the sub-affiliates in spamming AIP's campaigns to prospective investors.

79.     The Marketing Defendants, directly and indirectly through sub-affiliates, and as part of the approximately twenty (20) binary options campaigns they launched, disseminated tens of millions of emails to prospective investors containing false and misleading information.

## IV.     THE MARKETING DEFENDANTS ALSO ACTED AS "SUB-AFFILIATES" BY SPAMMING OTHER MARKETERS' BINARY OPTIONS CAMPAIGNS

80.     In addition to launching their own campaigns, Marketing Defendants acted as "sub-affiliates" during the Relevant Period and disseminated fraudulent solicitations in the U.S.

and abroad for approximately fourteen (14) fraudulent binary options campaigns launched by

other marketers.  These campaigns included at least the following nine known by name:

> (1) Autobitcoin Cash (from at least February 2014);
> (2) Binary Pilot (from at least about February 2014);
> (3) Daily Binary Profit/Binary Profits Daily (from at least March 2014);
> (4) Income Rush (from at least March 2014);
> (5) Profit Partners (from at least March 2014);
> (6) Easy Profits (from at least March 2014);
> (7) Money Platform (from at least January 2015);
> (8) Copy Op (from at least February 2015 until at least May 2015); and
> (9) Copy Trade Profit (from at least April 2015).

81.     These binary options campaigns worked like the campaigns the Marketing

Defendants themselves launched, including by deceiving potential investors through a website,

one or more videos, and various email swipes.

82.     As with the campaigns the Marketing Defendants themselves launched, the

campaigns they participated in as sub-affiliates routinely included materially false or misleading

information or artifices or devices designed to elicit interest and deceive recipients with either

false statements or false appearances of fact.

83.     As with the campaigns the Marketing Defendants themselves launched, these

campaigns typically touted "free" and "automatic" trading with software that did not exist,

offered false guarantees of extraordinary profits by trading, and used false proof in the form of

fabricated account statements, fictitious "live" demonstrations, and fake testimonials.

84.     As with the campaigns the Marketing Defendants themselves launched, the true

goal of these campaigns was not to provide any such software or trading systems that worked as

claimed but rather to earn commissions through "recommended" brokers by inducing individuals

to open and fund a binary options trading account.

85.     When acting as a sub-affiliate for other marketers' campaigns, the Marketing Defendants received commissions for each person to whom they sent the affiliate's marketing materials, and who opened and funded an account.  The Marketing Defendants also frequently earned prizes based on their performance, including thousands of dollars and/or in kind rewards.

86.     The Marketing Defendants knew or were reckless in not knowing that the materials they disseminated as sub-affiliates were false, misleading and deceptive.  Atkinson even joked with other affiliates about mailing out their solicitations knowing they were "scams."

87.     Passerino was responsible for sending out emails when the Marketing Defendants acted as a sub-affiliate for other's campaigns.  Marketing Defendants, primarily by Passerino, sent thousands of solicitation emails when acting as sub-affiliates for binary options campaigns.

## V.     ATKINSON DISPARAGED INVESTORS IN SKYPE CHATS

88.     In their Skype chats, Atkinson and other binary options marketers ridiculed individuals who opened and funded accounts with binary options brokers after watching the marketers' videos.  In one example, an April 2015 chat, Atkinson and other marketers joked about the fraudulent nature of recent binary options campaigns.  One marketer referred to the latest binary offer, sarcastically, "[H]ow come it now takes 30 days to become a millionaire?  last (*sic*) time it was only 7 . . . and [A]ntonio [Giacca] promises it in 60 seconds!"  Atkinson replied, "[H]ahaha . . . that is some funny shit lol . . . we could call these scams anything and they will buy it."  In another Skype, Atkinson mocked U.S. recipients of his fraudulent solicitations as "stupid" and bragged, "I guess that's why I love living here easy scammin [(*sic*)] [.]"

89.     Atkinson referred to his binary options marketing scheme as "like the Holy Grail," "because we can make any claims we want and it's not on us, it's on the broker."  He told a network of his sub-affiliates on one of his campaigns, "- I invested over $50,000 on the sales

videos.  - I'm giving away $100,000 in cash prizes. - Cutting edge sales funnel.  - Hired a big gun just for this and boy he rocks!  …. I feel like Kayne West when he creates music. He gets all the best minds in music in the world to his studio to help him. I took this same approach with this offer.  With the Binary market unstable I wanted to make sure we all cashed in BIG before the wave crumbles and crashes. I have put all my chips in on this offer …. Let's all milk this binary wave while we can and let my new CRAZY offer help reach your income goals for 2015."

90.     But in testimony during the Commission's investigation, Atkinson claimed (falsely) to know nearly nothing about binary options, the brokers involved in payments to him, or what triggered payment to AIP.  He claimed (falsely) that his videos were a function of his artistic vision, not efforts to sell binary options.  He claimed that his chat messages were jokes.

### VI.     PASSERINO BRAGGED THEY WERE CROOKS, THEN TOOK THE FIFTH

91.     Passerino bragged to other marketers about his role at AIP: "Tim doesn't pay me, I pay him . . . latr!!!!crooksssss".  Yet during the investigation leading to this Complaint, the Commission subpoenaed Passerino to give testimony under oath about his role and such statements as this one.  Passerino was asked numerous questions about his involvement in disseminating binary options campaigns and in the activities of Atkinson and AIP.  Passerino declined to answer the questions asked of him in testimony by invoking his Fifth Amendment privilege against self-incrimination.

### VII.    THE MARKETING DEFENDANTS OFTEN COORDINATED WITH BINARY OPTIONS BROKERS THROUGH AN INTERMEDIARY

92.     The Marketing Defendants' profits depended on individuals opening and funding accounts with the binary options brokers identified in the marketing materials; the Marketing Defendants received commissions *only* if customers opened and deposited funds in those

brokers' accounts.   If customers received the AIP campaign materials and did not open and fund an account, the Marketing Defendants received nothing.

93.     Instead of coordinating their campaigns directly with brokers, the Marketing Defendants worked with a broker intermediary that maintained direct relationships with binary options marketers and brokers.  The broker intermediary coordinated with the Marketing Defendants and brokers to launch marketing campaigns that would result in large numbers of individuals opening and funding new binary options accounts with those brokers.

94.     For example, the broker intermediary selected the "recommended" brokers identified on the Marketing Defendants' campaigns and directed individuals to particular brokers to open accounts and begin binary options trading.  The intermediary also worked with brokers to ensure that their sales representatives personally solicited persons who received the Marketing Defendants' videos but did not immediately open accounts, to encourage them to fund accounts and begin trading.   The broker intermediary also worked to ensure that brokers used the Marketing Defendants' fraudulent marketing materials to re-solicit these prospects via email and sales calls.  For example, before the Marketing Defendants launched a new marketing campaign, the intermediary disseminated links to the campaign website to brokers with instructions for them to watch the video before contacting prospective investors.

95.     The broker intermediary also handled Marketing Defendants' commission payments.  Brokers paid the Marketing Defendants approximately $350 to $450 each time someone who received the Marketing Defendants' videos and materials opened and funded a new trading account.  The broker intermediary received those funds from the brokers and made the commission payments to the Marketing Defendants.

96.     None of the brokers with whom the Marketing Defendants indirectly worked was registered with the Commission in any capacity.  None of the their products, the binary options securities offered or sold to investors who were brought to these unregistered brokers by the Marketing Defendants, were registered as securities with the Commission.

97.     Additionally, on at least two occasions, a broker intermediary provided Marketing Defendants with binary options videos that contained materially false and misleading statements. Defendants intentionally or recklessly included and disseminated this false or misleading information as part of their marketing campaigns.

### VIII.   THE MARKETING DEFENDANTS TRIED TO COVER THEIR TRACKS

98.     In or about October or November 2016, the Marketing Defendants removed and/or disabled access to AIP's binary options campaign websites.

99.     In or about October or November 2016, the Marketing Defendants deleted and/or otherwise destroyed videos, emails, websites, and other documents and communications related to binary options, including Skype communications and materials related to Facebook.

100.    The Marketing Defendants took these steps after they received a subpoena from the Commission requesting binary options campaign communications and documents.

### IX.    THE MARKETING DEFENDANTS SCAMMED TENS OF THOUSANDS OF INDIVIDUALS, EARNING THEMSELVES MILLIONS OF DOLLARS

101.    Between October 2013 and June 2016, AIP's financial accounts received approximately twenty-seven million dollars ($27,000,000) resulting from the Marketing Defendants' affiliate marketing activities, including, and primarily, fraudulent binary options solicitations.  The Marketing Defendants received payments from brokers, broker intermediaries, payment processors, and affiliate networks, among others.  A portion of these earnings stemmed from their role as sub-affiliates for other fraudulent binary options campaigns.

102.     Between October 2013 and October 2016, AIP deposited over one million and eight hundred thousand dollars ($1,800,000) into a bank account in the name of Gasher, Inc. This account was controlled by Passerino, who controlled Gasher.

103.     Between January 2014 and June 2016, at least 68,000 persons opened and funded binary options trading accounts in connection with the Marketing Defendants' campaigns.

104.     The amount of money individuals deposited when opening a new account varied. Generally, customers were required to deposit at least $250 initially.  Therefore, the 68,000 accounts opened between January 2014 and June 2016, resulted in deposits of at least $17 million in trading accounts after making it through Defendants' deceptive binary options funnels.

105.     The amount of total deposits and losses was much higher as brokers continued to solicit prospective investors to deposit additional funds, often relying on the Marketing Defendants' marketing materials to do so.

106.     Tens of millions of individuals received Defendants' fraudulent solicitations.  For example, in less than 3 weeks, the Push Money App website had over 2 million visitors and the campaign generated commissions for the Marketing Defendants for almost nine months.

## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### FIRST CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**
**Violations of Section 17(a) of the Securities Act**
**(against all Marketing Defendants)**

107.     Paragraphs 1-106 are realleged and incorporated by reference herein.

108.     The Marketing Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

28

(a)  with scienter, employed devices, schemes, or artifices to defraud;

(b)  obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)  engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

109.    By reason of the foregoing, each of the Marketing Defendants violated, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities
Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(against all Marketing Defendants)**

110.    Paragraphs 1-106 are realleged and incorporated by reference herein.

111.    The Marketing Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

(a)  employed devices, schemes, or artifices to defraud;

(b)  made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)  engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

112.    By reason of the foregoing, each of the Marketing Defendants violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### THIRD CLAIM FOR RELIEF

**Unregistered Offer or Sale of Securities**
**Violations of Section 5 of the Securities Act**
**(against all Marketing Defendants)**

113.    Paragraphs 1-106 are realleged and incorporated by reference herein.

114.    No registration statement had been filed or was in effect for any of the security-based binary options offered or sold through the Marketing Defendants' marketing campaigns.

115.    The Marketing Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to sell such securities.

116.    By reason of the foregoing, each of the Marketing Defendants violated, and unless enjoined will again violate, Section 5 of the Securities Act, 15 U.S.C. §§ 77e.

### FOURTH CLAIM FOR RELIEF

**Fraud In Connection with the Purchase or Sale of Securities**
**By or Through Means of Others;**
**Violations of Section 20(b) of the Exchange Act**
**(Against Atkinson)**

117.    Paragraphs 1-106 are realleged and incorporated by reference herein.

118.    Atkinson with scienter created and disseminated such marketing materials as described above by and through the means of others and in the various manners described above.

119.    Atkinson, for example, enlisted sub-affiliates to spam his and AIP's materially false and misleading binary options campaign materials to tens of thousands of prospective investors.  He offered to pay sub-affiliates for each time a prospect, after receiving materials

30

from a sub-affiliate, opened and funded a binary options account with the campaign's recommended broker.  He also ran contests that offered prizes to the most successful sub-affiliates, to create incentives for further disseminating these fraudulent campaigns.

120.   Atkinson, by exercising control of, or providing directives or incentives to, AIP and Passerino, also disseminated materially false and misleading binary options marketing materials by and through AIP and Passerino.  Atkinson controlled, directed, or incentivized the dissemination of such materials by and through AIP and Passerino both that he created or caused to be created and that other affiliate marketers created and then provided to him or AIP for dissemination (that is, where he/AIP acted on others' campaigns as a sub-affiliate marketer).

121.   By reason of the foregoing, Atkinson directly or indirectly engaged in acts and things which it would be unlawful for Atkinson to do under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by and through the means of other persons, in violation of Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b).  Unless enjoined, Atkinson will again violate Section 20(b) of the Exchange Act.

### FIFTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**
**Aiding and Abetting Violations of Section 17(a) of the Securities Act**
**(Against all Marketing Defendants)**

122.   Paragraphs 1-106 are realleged and incorporated by reference herein.

123.   The Marketing Defendants each violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).  The Marketing Defendants also knowingly or recklessly provided substantial assistance to each of the other Marketing Defendants' violations of Section 17(a) and knowingly or recklessly provided substantial assistance to violations of Section 17(a) by other affiliate marketers launching the fraudulent binary options campaigns identified in this Complaint.

124.   By reason of the foregoing, Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), deems each of the Marketing Defendants to be in violation of Section 17(a) of the Securities Act to the same extent as the others to whom such assistance was provided, and unless enjoined, each of them will again aid and abet violations of Section 17(a)

## SIXTH CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against all Marketing Defendants)**

125.   Paragraphs 1-106 are realleged and incorporated by reference herein.

126.   The Marketing Defendants each violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  The Marketing Defendants also knowingly or recklessly provided substantial assistance to each of the other Marketing Defendants' violations of Section 10(b) and Rule 10b-5 and knowingly or recklessly provided substantial assistance to violations of Section 10(b) and Rule 10b-5 by other affiliate marketers launching the fraudulent binary options campaigns identified in this Complaint.

127.   By reason of the foregoing, Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), deems each of the Marketing Defendants to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as the others to whom such assistance was provided.  Unless enjoined, each of them will again aid and abet violations of those provisions.

## SEVENTH CLAIM FOR RELIEF

**Control Person Liability for Violations of**
**Section 10(b) of the Exchange Act and Rule 10b-5 by AIP**
**(against Atkinson)**

128.   Paragraphs 1-106 are realleged and incorporated by reference herein.

129.    When AIP violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and

Rule 10b-5 thereunder (including directly and as an aider and abettor of violations) and Section

20(b) of the Exchange Act, 15 U.S.C. § 78t(b), Atkinson directly or indirectly controlled AIP.

130.    Atkinson induced directly or indirectly the acts constituting AIP's violations and

cannot establish that he acted in good faith and was not a culpable participant in the violations.

131.    By reason of the foregoing, Atkinson is jointly and severally liable pursuant to

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), with and to the same extent as AIP for

AIP's violations of Sections 10(b) and 20(b) of the Exchange Act and Rule 10b-5.  Unless

enjoined, Atkinson will again act as a control person of AIP in connection with such violations.

## EIGHTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**
**Aiding and Abetting Violations of Section 17(a) of the Securities Act**
**(Against Pollen, Berry and BWM)**

132.    Paragraphs 1-106 are realleged and incorporated by reference herein.

133.    Pollen, Berry, and BMW each knowingly or recklessly provided substantial

assistance to violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), by the

Marketing Defendants.  Berry and BWM each also knowingly or recklessly provided substantial

assistance to violations of Section 17(a) of the Securities Act by other affiliate marketers

launching fraudulent binary options campaigns, in addition to the Marketing Defendants.

134.    By reason of the foregoing, Section 15(b) of the Securities Act, 15 U.S.C. §

77o(b), deems each of them to be in violation of Section 17(a) of the Securities Act to the same

extent as the others to whom such assistance was provided.  Unless enjoined, Pollen, Berry and

BMW will again aid and abet violations of Section 17(a).

## NINTH CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Against Pollen, Berry and BMW)**

135.    Paragraphs 1-106 are realleged and incorporated by reference herein.

136.    Pollen, Berry, and BMW each knowingly or recklessly provided substantial assistance to violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by the Marketing Defendants.  Berry and BWM each also knowingly or recklessly provided substantial assistance to violations of Section 10(b) of the Exchange Act and Rule 10b-5 by other affiliate marketers launching fraudulent binary options campaigns, in addition to the Marketing Defendants.

137.    By reason of the foregoing, Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), deems each of them to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as the others to whom such assistance was provided.  Unless enjoined, Pollen, Berry and BMW will again aid and abet violations of those provisions.

## TENTH CLAIM FOR RELIEF

**Control Person Liability for Violations of**
**Section 10(b) of the Exchange Act and Rule 10b-5 by BMW**
**(against Berry)**

138.    Paragraphs 1-106 are realleged and incorporated by reference herein.

139.    When BMW violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (as an aider and abettor of violations of the Marketing Defendants and of other marketers), Berry directly or indirectly controlled BMW.

140.    Berry induced directly or indirectly the acts constituting BMW's violations and cannot establish that he acted in good faith and was not a culpable participant in the violations.

141.    By reason of the foregoing, Berry is jointly and severally liable pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), with and to the same extent as BMW for its deemed violations of Section 10(b) of the Exchange Act and Rule 10b-5.  Unless enjoined, he will again act as a control person of BMW in connection with such violations.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

a)    Find that Defendants committed the alleged violations;

b)    Order Defendants to disgorge, with prejudgment interest, all ill-gotten gains he or it received or derived from the activities set forth in this Complaint, and to repatriate any ill-gotten funds or assets he or it caused to be sent overseas;

c)    Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3);

d)    Order Defendant Atkinson and Defendant Berry liable for the liabilities of his entity, Defendant AIP or Defendant BMW, respectively, as control persons;

e)    Order all Defendants prohibited from, directly or indirectly, including through any entity he owns or control, participating in the marketing, offer or sale of securities over the Internet or by email or other forms of electronic communication;

f)    Permanently enjoin Defendants Atkinson, Passerino, and AIP from directly or indirectly violating Sections 5 and 17(a) of the Securities Act, 15 U.S.C. §§ 77e & 77q(a), and Sections 10(b) and 20(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78t(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

g)      Permanently enjoin Defendants Pollen, Berry, and BMW from directly or

indirectly violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b)

of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

h)      Retain jurisdiction over this action in order to implement and carry out the

terms of all orders and decrees that it may enter, or to entertain any suitable application or

motion for additional relief within the jurisdiction of this Court; and

i)      Grant such other and further relief as may be necessary or appropriate.

## JURY TRIAL DEMAND

The Commission demands a jury trial on all issues triable of right by a jury.

Dated:  September 27, 2018

Respectfully submitted,

/s/ Kenneth W. Donnelly

Kenneth W. Donnelly (trial counsel)
Email: donnellyk@sec.gov
Telephone: (202) 551-4946

Attorney for Plaintiff
**Securities and Exchange Commission**
100 F Street, N.E.
Washington, DC 20549-5949
Tel. (202) 551-6000
Fax (202) 772-9282

Of Counsel:

Jennifer A. Leete
Michael S. Fuchs
Jason M. Anthony